UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X
                                                   :

JEANNE V. FRIEDMAN,               :       23 Civ. 8901 (GHW) (GS)

                Plaintiff,         :       <u>OPINION & ORDER</u>

             - against -        :

SUNRISE SENIOR LIVING       :
MANAGEMENT, INC.,            :

             Defendant.      :

                                                   :
--------------------------------------------------------------------------X

**GARY STEIN, United States Magistrate Judge:**

      Plaintiff Jeanne V. Friedman ("Plaintiff" or "Friedman") brings this action

against Defendant Sunrise Senior Living Management, Inc. ("Defendant" or

"Sunrise") alleging, *inter alia*, that Sunrise unlawfully requested Friedman's

consumer credit history for purposes of employment in violation of the New York

City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-502(a) *et seq.*

Sunrise moves to stay this action and compel Friedman to arbitrate her claims

under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, pursuant to a

Dispute Resolution Agreement entered into by the parties. (Dkt. No. 34.) For the

reasons set forth below, Sunrise's motion is **DENIED**.[1]

---

[1] On October 12, 2023, the Honorable Gregory H. Woods referred this action to the undersigned for
general pretrial supervision, including non-dispositive motions, as well as all dispositive motions
requiring a report and recommendation. (Dkt. No. 6). "District courts in this Circuit have regularly
concluded that a motion to compel arbitration and stay litigation pending arbitration is non-
dispositive and therefore within a Magistrate Judge's purview to decide without issuing a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)." *Martinez v. GAB.K,
LLC*, 741 F. Supp. 3d 26, 30 n.1 (S.D.N.Y. 2024) (citation omitted). Thus, the undersigned issues
this decision as an Opinion & Order.

**BACKGROUND**

**A.     Factual Background**[2]

In February 2023, Friedman, a registered nurse, applied and interviewed for employment at Sunrise, a national chain of senior living centers.  (Compl. ¶¶ 1, 8).  Friedman applied for a "wellness nurse" position at a Sunrise facility located in Manhattan.  (*Id.* ¶ 8).  Not long thereafter, on March 13, 2023, Sunrise sent an e-mail to Friedman informing her that Sunrise was offering her the job.  (*Id.* ¶ 9; Pl. Decl. Ex. 2 at 4).  The e-mail included a link to an "Offer Letter and Background Packet" and provided the following instructions to Friedman:

> Please click on the link to review a copy of your offer letter.  Should you choose to accept, check the electronic signature box, confirming your acceptance and complete the background forms proceeding.  All forms must be completed to proceed with your acceptance.

(Compl. ¶ 9; Pl. Decl. Ex. 2 at 9).

Among other things, the Offer Letter (i) stated that Sunrise is "pleased to offer [Friedman] the position of Wellness Nurse RN"; (ii) provided a "projected start date" of March 27, 2023; (iii) set forth Friedman's hourly rate and sign-on bonus; and (iv) informed Friedman that she "will be eligible to participate in the employee benefits program on the 1st of the month following [her] date of hire."  (Def. Decl. Ex. B).  The Offer Letter further included the following paragraph:

> [I]t is Sunrise's policy that all potential team members that have accepted a job offer must have drug screen,

---

[2] The following facts are based on Plaintiff's allegations in her operative complaint, filed on April 17, 2024 (Dkt. No. 31 ("Compl.")), and the declarations and attached exhibits submitted in connection with Sunrise's motion to compel arbitration from Linda Keech, a Sunrise employee with the title "Vice President of Total Rewards" (Dkt. No. 36-3 ("Def. Decl.")), and Jonathan A. Bernstein, Friedman's counsel (Dkt. No. 38 ("Pl. Decl.")).

> background and reference checks completed.  This offer is
> contingent upon the successful completion of your drug
> screen (which does not include marijuana), background
> investigation and reference checks.  In addition, as a
> condition of employment, you are required to agree and
> sign the Sunrise Senior Living Dispute Resolution
> Agreement.

(*Id.*).  The Offer Letter requested that Friedman sign and return it, adding that the

offer would expire in 72 hours.  (*Id.*).

The referenced "Sunrise Senior Living Dispute Resolution Agreement"

("Dispute Resolution Agreement" or "DRA"), which was also included in the linked

package of documents sent to Friedman, proscribes a "three-step program" for the

resolution of certain legal disputes between the parties, consisting of (i) direct

communication; (ii) non-binding mediation; and (iii) if the dispute remains

unresolved, binding arbitration administered by JAMS.  (DRA at 1).[3]  In describing

what disputes are subject to this program, the Dispute Resolution Agreement

provides, in relevant part:

> We both agree to use the three-step program in this
> agreement to resolve *any and all legal disputes that may
> come up between us during or after your employment that
> arise out of or relate in any way to your employment or its
> termination*, except those disputes excluded below.  This
> applies to legal disputes you may have against Sunrise
> Senior Living Management, Inc., its parents, subsidiaries
> and affiliates (collectively, "Sunrise"), and Sunrise's
> officers, directors, shareholders, employees and agents.  It
> also applies to legal disputes Sunrise may have against
> you.  We both agree to waive our right to bring any such
> legal disputes before a judge or jury, and to waive our
> right to bring or participate in any such legal disputes on
> a class, collective, or representative action basis, and

---

[3] Both parties submitted a copy of the Dispute Resolution Agreement in connection with Sunrise's
motion.  (Pl. Decl. Ex. 1; Def. Decl. Ex. C).

> instead agree to have these legal disputes resolved
> exclusively on an individual basis under this agreement.

(*Id.* (emphasis added)).  The Dispute Resolution Agreement states that it "becomes effective on the date you sign below."  (*Id.* at 3).

On the morning of March 14, 2023, Friedman signed the Offer Letter and the Dispute Resolution Agreement and electronically saved and submitted these documents to Sunrise.  (Def. Decl. ¶¶ 13–14 & Ex. B at 2; DRA at 3; *see also* Compl. ¶ 10).  Later that same morning, however, Friedman sent an e-mail to Sunrise stating that she was prompted "to sign a credit check query" and that "NYC employers violate the law (NYCHRL) should they request for employees or potential employees to sign such a document."  (Compl. ¶ 10; Pl. Decl. Ex. 2 at 3).  Friedman concluded this e-mail by informing Sunrise that its electronic system would not allow her to continue without executing the authorization and asking Sunrise to advise her how to proceed.  (Compl. ¶ 10; Pl. Decl. Ex. 2 at 4).

The parties engaged in an e-mail exchange discussing the credit check issue over the course of the next several weeks.  (Compl. ¶¶ 11–14; Pl. Decl. Ex. 2).  In the meantime, Friedman's start date was postponed indefinitely.  (Pl. Decl. Ex. 2 at 7).  Ultimately, on April 6, 2023, Sunrise sent Friedman an email thanking her for her "interest in [the] position," "wish[ing] [her] success in [her] career search," and informing her if a position opens up that matches her qualifications, Sunrise will contact her.  (Compl. ¶ 15; Pl. Decl. Ex. 2 at 9).  Construing this e-mail to constitute

a withdrawal of Sunrise's offer,[4] Friedman initiated this action several months later, on October 10, 2023, alleging that Sunrise's failure to hire her was an act of retaliation for Friedman's refusal to authorize a credit check, and that such conduct violates the NYCHRL.  (Dkt. No. 1; Compl. ¶¶ 19–28).[5]

### B.    Defendant's Motion to Compel Arbitration

On April 26, 2024, Sunrise filed its instant motion, seeking an order staying this action[6] and compelling Friedman to bring her claims in a binding arbitration proceeding.  (Dkt. No. 34).  The motion was accompanied by a supporting brief (Dkt. No. 35 ("Def. Br.")) and a Declaration from Sunrise Vice President of Total Rewards Linda Keech (Dkt. No. 36-3 (*i.e.*, "Def. Decl.")).

Sunrise asserts that the Dispute Resolution Agreement—pursuant to which the parties agreed to arbitrate all legal disputes "that may come up . . . during or after [Friedman's] employment that arise out of or relate in any way to [Friedman's] employment or its termination"—requires Friedman to arbitrate her claims.  (Def.

---

[4] Sunrise agrees that its "offer was withdrawn."  (Dkt. No. 48 at 15:2; *see also* Reply at 6 (acknowledging "Defendant's withdrawal of the offer")).

[5] After filing her initial complaint, Plaintiff filed several nearly identical amended pleadings, all of which the Clerk's Office electronically marked as deficient in form for various reasons.  (*See* Dkt. Nos. 23, 25, 29, 31).  The last in this series of filings (Dkt. No. 31) names as the sole defendant "Sunrise Senior Living Management, Inc.," the corporate name of the moving Defendant, as opposed to "Sunrise Senior Living, Inc.," the sole defendant named in the initial complaint (Dkt. No. 1).  (*See* Dkt. No. 28 (terminating Sunrise Senior Living, Inc. as a defendant)).  It is also the version of the complaint cited by Sunrise in support of its motion (*see* Dkt. No. 35 at 1 (citing Dkt. No. 31 as the operative complaint)).  The Court thus considers Docket No. 31 to be the operative complaint.

[6] In its motion and moving brief, Sunrise states it seeks an order compelling arbitration and "dismissing this action or, alternatively, staying the action."  (Dkt. No. 34; Dkt. No. 35 at 1; *but see id.* at 16 (requesting a stay only)).  Sunrise's reply brief, however, clarifies that Sunrise is seeking a stay pending arbitration and "is not seeking to dismiss," relying on the Supreme Court's recent decision in *Smith v. Spizziri*, 601 U.S. 472 (2024) (holding that when a dispute in federal court is subject to arbitration, and the party seeking arbitration seeks a stay, the FAA compels the court to grant a stay and does not permit the court to dismiss the action).  (Dkt. No. 40 at 9 n.1).

Br. at 11; DRA at 1). In support, Sunrise contends that "employment" is a "broad concept" meaning, *inter alia*, the "act of employing," and that Sunrise was engaged in this process at the time the basis for Friedman's claims arose—*i.e.*, Sunrise's request for her to authorize a credit check and ultimate withdrawal of its offer after she refused to do so. (Def. Br. at 14).

On May 10, 2024, Friedman submitted her brief in opposition to Sunrise's motion (Dkt. No. 39 ("Pl. Br.")), along with a Declaration from her counsel (Dkt. No. 38 (*i.e.*, "Pl. Decl.")). Friedman agrees that the Dispute Resolution Agreement is a valid and enforceable arbitration agreement but disagrees that her claims fall within its scope. (Pl. Br. at 1). Friedman emphasizes that the agreement to arbitrate is limited to those disputes that "come up . . . *during or after*" her "employment," and contends that her employment never began. (*Id.* at 1, 9–18 (form of emphasis altered)). Friedman posits that in this context "employment" means "the period during which the employee is providing services for pay," and it is undisputed that Friedman never started working at Sunrise or received any pay. (*Id.* at 9).

On May 17, 2024, Sunrise submitted its reply, reiterating its broad construction of "employment" and asserting that the parties' communications evince Friedman's acceptance of its offer and both parties' intention to continue with her employment. (Dkt. No. 40 ("Reply")).

On August 13, 2024, the Court held oral argument on the motion. (*See* Oral Argument Transcript (Dkt. No. 48) ("Tr.")). Pursuant to the discussion at this

hearing, Friedman submitted a supplemental letter the same day addressing the applicable burden where, as here, a party opposes arbitration based on the scope of the relevant agreement.  (Dkt. No. 46).  On August 16, 2024, Sunrise submitted a letter in response, informing the Court that it rests on its arguments set forth in its briefing.  (Dkt. No. 47).

## LEGAL STANDARDS

The FAA, which "reflects a liberal federal policy favoring arbitration agreements," *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (citations omitted), dictates that any contract containing a binding arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2.  Section 4 of the FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement[.]"  9 U.S.C. § 4.  "A party has 'refused to arbitrate' within the meaning of Section 4 if it 'commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so.'"  *Shenzhen Xingchen Xuanyuan Indus. Co. v. Amazon.com Servs. LLC*, 735 F. Supp. 3d 453, 461 (S.D.N.Y. 2024) (quoting *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004)).

"Arbitration is a matter of contract, and 'the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'"  *Feld v.*

*Postmates, Inc.*, 442 F. Supp. 3d 825, 828 (S.D.N.Y. 2020) (quoting *AT & T Techs.,
Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).[7]  "To rule on a petition
to compel arbitration, the Court must decide two main issues: '(1) whether the
parties agreed to arbitrate, and (2) if so, whether the scope of the agreement
encompasses the claims at issue.'"  *Abuda v. Strongblock*, No. 22 Civ. 10869 (LTS)
(BCM), 2023 WL 6294205, at *4 (S.D.N.Y. Sept. 27, 2023) (quoting *Cornelius v.
Wells Fargo Bank, N.A.*, No. 19 Civ. 11043 (LJL), 2020 WL 1809324, at *3 (S.D.N.Y.
Apr. 8, 2020)); *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*,
88 F.3d 129, 135 (2d Cir. 1996).

The party seeking to compel arbitration "bears an initial burden of
demonstrating that an agreement to arbitrate was made."  *Zachman v. Hudson
Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022).  "Whether an
arbitration agreement exists is a matter of state contract law."  *Whyte v. WeWork
Companies, Inc.*, No. 20 Civ. 1800 (CM), 2020 WL 3099969, at *3 (S.D.N.Y. June 11,
2020).  "This burden does not require the moving party to show initially that the
agreement would be *enforceable*, merely that one existed."  *Hines v. Overstock.com,*

---

[7] Relying on a decision from the Delaware Supreme Court, Sunrise suggests in a footnote that "the
Court is within its authority to refer questions of arbitrability to the arbitrator."  (Def. Br. at 11 n.2
(citing *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006))).  At oral argument,
however, Sunrise clarified that while it maintains the arbitrator has the power to determine
arbitrability, it acknowledges that a court holds this power as well, and it is asking the Court to
determine arbitrability here.  (Tr. 5:3–12).  Accordingly, and because the Dispute Resolution
Agreement does not affirmatively indicate that the parties agreed to arbitrate the arbitrability issue,
the Court proceeds to determine arbitrability.  *See, e.g.*, *Cont'l Cas. Co. v. Hopeman Bros., Inc.*, No.
17 Civ. 688 (ALC), 2018 WL 1581987, at *5 (S.D.N.Y. Mar. 27, 2018) ("Questions of arbitrability are
presumptively resolved by courts, rather than the arbitrator, unless 'the parties clearly and
unmistakably provide otherwise.'") (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84
(2002)).

*Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (emphasis in original).  Accordingly, "[t]his

burden may be satisfied by the actual production of the arbitration agreement."

*Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 222 (S.D.N.Y. 2024) (citation

omitted).

      "If the Court finds that the parties entered into an arbitration agreement, it

must then determine 'whether the dispute at issue comes within the scope of the

arbitration agreement.'"  *Id.* (quoting *ACE Cap. Re Overseas Ltd. v. Cent. United

Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)).  "A party to an arbitration agreement

seeking to avoid arbitration generally bears the burden of showing the agreement to

be inapplicable or invalid."  *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d

Cir. 2010).  Although courts in this Circuit previously began this analysis by

"'classify[ing] the particular [arbitration] clause as either broad or narrow,'" *Silver*,

724 F. Supp. 3d at 222 (quoting *Keystone Food Holdings, Ltd. v. Tyson Foods, Inc.*,

492 F. Supp. 3d 134, 143 (S.D.N.Y. 2020)), "'[c]ourts can no longer rely on broad

arbitration clauses to presume arbitrability in the first instance,'" *id.* (quoting

*Galanova v. Morgan Stanley Servs. Grp. Inc.*, No. 23 Civ. 183, 2023 WL 6198823, at

\*4 (S.D.N.Y. Sept. 22, 2023)).  As the Second Circuit has explained, the Supreme

Court's ruling in *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010),

abrogated prior Second Circuit cases directing courts first to identify the arbitration

clause as broad or narrow and then to apply a presumption of arbitrability if the

clause is broad.  *Local Union 97 v. Niagara Mohawk Power Corp.*, 67 F.4th 107,

113–14 (2d Cir. 2023).

Rather, courts must first turn to "ordinary principles of contract interpretation" under state law to assess whether the "particular dispute is covered by the language to which the parties agreed." *Id.* at 114; *see Nunez v. JPMorgan Chase Bank, N.A.,* No. 23 Civ. 7569 (PAE), 2024 WL 244624, at *7 (S.D.N.Y. Jan. 23, 2024) ("To determine whether parties have agreed to arbitrate and whether such an agreement is enforceable, courts apply state contract law."). "'[C]ourts must construe arbitration clauses because a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Local Union 97,* 67 F.4th at 116 (quoting *Granite Rock,* 561 U.S. at 301 n.8). As such, "the presumption of arbitrability is a court's last, rather than first, resort" and is invoked "only where the parties' dispute concerns a valid and enforceable agreement to arbitrate that is ambiguous as to its scope." *Id.* at 113–14; *see Silver,* 724 F. Supp. 3d at 222.

"In deciding a motion to compel arbitration, the Court applies a 'standard similar to that applicable for a motion for summary judgment.'" *Silver,* 724 F. Supp. 3d at 222 (quoting *Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir. 2003)). As on a motion for summary judgment, the court therefore "consider[s] all relevant, admissible evidence submitted by the parties and . . . draw[s] all reasonable inferences in favor of the non-moving party.'" *EX.CO Techs. Ltd. v. Empire Med. Grp.,* No. 22 Civ. 6383 (MKV), 2023 WL 5035175, at *2 (S.D.N.Y. Aug. 8, 2023) (quoting *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 229 (2d Cir. 2016)). "'Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of

that legal issue and avoid the need for further court proceedings." *Id*. (quoting

*Meyer*, 868 F.3d at 74).[8]

## DISCUSSION

The Court finds that, while a valid and enforceable agreement to arbitrate

exists between the parties, Friedman's claims are not encompassed within the scope

of that agreement.

### A.    Existence of an Agreement to Arbitrate

The first question the Court must determine is whether Friedman and

Sunrise agreed to arbitrate.  *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh*, 88

F.3d at 135.  Sunrise satisfied its initial burden of demonstrating that the parties

agreed to arbitrate by submitting a copy of the Dispute Resolution Agreement in

support of its motion.  *See Silver*, 724 F. Supp. 3d at 222.  Friedman does not

dispute that this agreement is a valid and enforceable agreement to arbitrate.  (Pl.

Br. at 1; Tr. 17:7–9).  Thus, the Court finds that there is a valid agreement to

arbitrate.  *See TIG Ins. Co. v. Am. Home Assurance Co.*, No. 18 Civ. 10183 (VSB),

2020 WL 605974, at *3 (S.D.N.Y. Feb. 7, 2020) ("The parties do not dispute that the

arbitration clauses created valid agreements to arbitrate.  Therefore, I find that the

arbitration clauses contained in the treaties create valid agreements to arbitrate.");

*Boss Worldwide LLC v. Crabill*, No. 19 Civ. 2363 (VB), 2020 WL 1243805, at *4

(S.D.N.Y. Mar. 16, 2020) (finding first prong satisfied because "the parties do

not dispute the Operating Agreement contains a valid agreement to arbitrate").

---

[8] Both parties invite the Court to decide the arbitrability issue as a matter of law on the basis of
their papers.  Neither has sought further development of the evidentiary record.

B.    **Scope of Agreement to Arbitrate**

Having found a valid and enforceable agreement to arbitrate, the Court turns

to the issue of whether Friedman's claims fall within the scope of the Dispute

Resolution Agreement.  *See, e.g.*, *ACE Cap. Re Overseas Ltd.*, 307 F.3d at 28.

1.    **Applicable Principles of Contract Law**

"Just as courts look to general state law contract principles to

determine whether parties have agreed to arbitrate, they look to general state

law contract principles to interpret the scope of an arbitration provision." *Fayez-*

*Olabi v. Credit Acceptance Corp.*, No. 21 Civ. 5443 (AMD) (LGD), 2022 WL 2918119,

at *4 (E.D.N.Y. July 25, 2022).  Here, the Dispute Resolution Agreement contains a

"Governing Law" clause providing that the agreement shall be governed by the FAA

and Delaware law.[9]  As a result, both parties look to Delaware law for the governing

principles of contract interpretation.  (Def. Br. at 6–8; Pl. Br. at 5–6).  The Court

will do the same.  *See Nunez*, 2024 WL 244624, at *5, *7 (applying New York law to

interpret an arbitration provision as the parties "do not appear to dispute that New

York law governs"); *In re Celsius Network LLC*, No. 22 Civ. 10964 (MG), 2024 WL

1719633, at *2, *5 (S.D.N.Y. Apr. 22, 2024) (applying Delaware law to interpret

scope of an arbitration agreement with Delaware choice-of-law clause).[10]

---

[9] In full, this clause states: "***Governing Law***: This dispute resolution agreement shall be governed by the Federal Arbitration Act and the law of the State of Delaware (without regard to its choice of law principles), unless otherwise required by the law of the state in which you primarily reside and work."  (DRA at 2).

[10] Choice of law is not outcome-dispositive here.  The parties do not point to, nor is the Court aware of, any inconsistency in Delaware's principles of contract interpretation and those of any other relevant jurisdiction that would have a material bearing on the resolution of this motion.

In analyzing disputes over the meaning of a contract, Delaware courts "give priority to the intention of the parties" and "start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009). Delaware law "compels courts interpreting contracts governed thereunder to look to the 'ordinary and usual meaning' of the language in a contract." *Celsius Network*, 2024 WL 1719633, at *5 (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)). Courts often "look to dictionaries to ascertain the ordinary meaning of terms not defined in a contract." *Manbro Energy Corp. v. Chatterjee Advisors, LLC*, No. 20 Civ. 3773 (LGS), 2021 WL 2037552, at *5 (S.D.N.Y. May 21, 2021) (citing *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835 (Del. Ch. Mar. 19, 2021)).

"Under Delaware law, where contract language is clear and unambiguous, the meaning of the contract is a matter of law for the court." *Umbach v. Carrington Inv. Partners (US), LP*, 851 F.3d 147, 157 (2d Cir. 2017) (collecting cases). "The mere fact that the parties have inconsistent views as to the meaning of a given contract provision does not mean that the term is ambiguous or that there is an issue of fact to be tried." *Id.* at 158. "'Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'" *Id.* (quoting *Rhone-Poulenc*, 616 A.2d at 1196).

###### 2.    Meaning of "During or After Your Employment"

The Dispute Resolution Agreement, on its face, submits to arbitration "any and all legal disputes that may come up between us during or after your employment that arise out of or relate in any way to your employment or its termination."  (DRA at 1).  Accordingly, to fall within the ambit of this provision, the underlying dispute between the parties must have come up "during or after" Friedman's "employment."

Viewed in accordance with its ordinary and usual meaning, the phrase "during . . . your employment" means a time period when the person was employed by Sunrise.  Consistent with the definition of "employment" advanced by Friedman here (*see* Pl. Br. at 9; Tr. 20:6–11), dictionaries commonly define "employment" as "an activity in which one engages or is employed" or "the state of being employed." *See, e.g.*, *Employment*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/employment (last visited Mar. 31, 2025); *Employment*, The Random House Dictionary of the English Language (2d ed. 1987); *Employment*, American Heritage Dictionary (4th ed. 2000); *see also Employment*, Black's Law Dictionary (11th ed. 2019) ("The quality, state, or condition of being employed; the condition of having a paying job"); *Rukszinis v. Argonaut Ins. Co.*, 774 F.3d 784, 788 (1st Cir. 2014) ("'Employment' is defined as 'the state of being employed; employ; service.'") (citation omitted).

In turn, to be "employed" typically means, in the context of the workplace, to have been engaged to provide services to another, *i.e.*, to be an employee.

*Employ / Employed*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/employed (last visited Mar. 31, 2025) ("to use or engage the services of"; "to provide with a job that pays wages or a salary"); *Employ*, American Heritage Dictionary (4th ed. 2000) ("To engage the services of; put to work"); *see also* Fair Labor Standards Act, 29 U.S.C. 203(g) (defining "employ" as "to suffer or permit to work"); *Varma v. TCC Wireless, LLC*, 478 F. Supp. 3d 724, 731 (N.D. Ill. 2020) (construing term "employment" in arbitration agreement to refer to "the period of time between when [plaintiff] became an employee and left the company").

Sunrise advances a broader interpretation of the agreement, relying on another common definition of the word "employment": "the act of employing." (Def. Br. at 14; Reply at 6; *see, e.g.*, *Employment*, American Heritage Dictionary (4th ed. 2000); *Employment*, Black's Law Dictionary (11th ed. 2019)). Based on that definition, Sunrise contends, "employment" can encompass the "process of hiring," and therefore legal disputes that arise during Friedman's "employment onboarding process" fall within the scope of the Dispute Resolution Agreement. (Tr. 4:8-11, 13:2, 14:15-16; *see also* Reply at 6 (arguing that "employment-related onboarding activities of a background check—i.e., 'the act of employing'— . . . fall squarely within the scope of the [Dispute Resolution Agreement]")).

This argument is unconvincing because it disregards the ordinary and usual meaning of the term "employment" in the context of the surrounding language in the parties' agreement. *See ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 1001 (Del. Ch. 2023) ("a word in a contract is to be read in light of the words

around it") (citation omitted).  The phrase "act of employing," as it is used by
Sunrise here, means *Sunrise's* "act" of "employing" Friedman—*i.e.*, it refers to the
actions of the *employer*.  But the relevant language in the Dispute Resolution
Agreement—"during *your* employment"—plainly means the *employee* must have
been employed.  The phrase "your employment" would have been an exceedingly
odd choice of words if the parties' intent was to capture disputes arising during
Sunrise's process of employing Friedman.  On the other hand, the phrase "your
employment" makes sense when "employment" is understood to mean the "state . . .
of being employed; the condition of having a paying job"—*i.e.*, Friedman's state of
being employed or having a paying job.  *See Employment*, Black's Law Dictionary
(11th ed. 2019).  This is the only reasonable understanding of "employment" as it is
used in the parties' agreement.  *See Lorillard Tobacco Co. v. Am. Legacy Found.*,
903 A.2d 728, 740 (Del. 2006) ("A court must accept and apply the plain meaning of
an unambiguous term in the context of the contract language and
circumstances[.]").

If Sunrise had wanted the Dispute Resolution Agreement to cover disputes
arising during the employment application or hiring or onboarding process, it could
easily have said so.  Other employers have written arbitration agreements of such
breadth.  *See, e.g.*, *Johnson v. Circuit City Stores*, 148 F.3d 373, 374 (4th Cir. 1998)
(dispute resolution agreement stating that "[t]his agreement requires you to
arbitrate any legal dispute related to *your application for employment or*
employment with Circuit City") (emphasis added); *Masasivam v. Am. Gen. Life Ins.*

*Co.*, No. 3:20-Civ-386, 2021 WL 4666628, at *2 (S.D. Tex. Oct. 7, 2021) (arbitration agreement covering claims and disputes "that arise either as *part of the hiring process or* during employment") (emphasis added). Instead, Sunrise chose to limit the scope of its Dispute Resolution Agreement solely to disputes arising "during or after your employment."

The Court cannot, in the guise of interpretation, rewrite the Agreement to encompass disputes arising "before, during or after your employment," or "during the hiring process," or "during your employment onboarding." To do so would violate a cardinal principle of contract interpretation. *See Allscripts Healthcare, LLC v. Andor Health, LLC*, Civil Action No. 21-704-MAK, 2022 WL 3594950, at *9 (D. Del. Aug. 23, 2022) ("When construing a contract, we cannot rewrite it or supply omitted provisions.") (citing *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983)); *see also Montfort v. Home Care Assistance of Ga.*, No. 1:18-CV-5628-CC-WEJ, 2019 WL 13097865, at *6 (N.D. Ga. Apr. 22, 2019) ("if HCA had desired for unsuccessful applicants like Ms. Monfort to be bound by the Agreement's arbitration provision, it could have done so by drafting a better contract.").

Accordingly, the Court rejects Sunrise's strained and atextual reading of the Dispute Resolution Agreement as applicable to disputes arising during the hiring or onboarding process. For the Agreement to apply, the dispute must have come up during Friedman's employment, meaning that she must have been employed by Sunrise at the time the dispute arose.

### 3.    Whether Friedman Was Employed by Sunrise

Sunrise argues that Friedman had "begun an employment relationship" with it when the parties' dispute arose.  (Reply at 5; *see also* Tr. 7:2–3, 9:19).  According to Sunrise, Friedman's employment with the company began when she signed the Offer Letter on March 14, 2023—which Sunrise calls her "date of hire"—and Sunrise then "terminated" her "employment" when it withdrew the offer on April 6, 2023.  (Tr. 11:4–8, 15:3–14).  This argument lacks merit.

The record before the Court, and in particular Sunrise's own documents, make it clear that Friedman was not employed by Sunrise at the time her claims arose.  As Friedman points out (Pl. Br. at 11), Sunrise expressly informed her that "[a]ll forms" must be completed for her to "proceed with her acceptance," and it is undisputed that Friedman did not complete these forms and immediately informed Sunrise that she would not complete the credit check authorization.  (Pl. Decl. Ex. 2 at 9).  The Offer Letter expressly stated that "[t]his offer is *contingent upon* the successful completion of your drug screen . . ., [a] background investigation and reference checks."  (Def. Decl. Ex. B (emphasis added)).  It is undisputed that none of those conditions were satisfied or affirmatively waived by Sunrise.  (Tr. 9:7–16; *see also id.* at 26:17–24).  It is also undisputed that Friedman never performed any work for Sunrise and was never paid by Sunrise.  (Pl. Br. at 11; Tr. 10:17–24).

Sunrise's arguments concerning Friedman's "date of hire" and the "termination" of her employment likewise contradict its contemporaneous representations.  First, the March 13, 2023 Offer Letter nowhere states or suggests

that Friedman's "date of hire" is the date she signs the Offer Letter.  To the contrary, it sets forth a "projected start date" of March 27, 2023 (which was subsequently postponed and never came to pass).  Moreover, the Offer Letter refers to Friedman's "date of hire" in a way that is inconsistent with Sunrise's claim, promising that Friedman would be "eligible to participate in the employee benefits program on the 1st of the month following your date of hire."  (Def. Decl. Ex. B at 1).  If the parties understood Friedman's "date of hire" to be March 14, 2023, the date she signed the Offer Letter, then Friedman would have been eligible to participate in the employee benefits program on April 1, 2023; but there is no indication that she was offered that opportunity or attempted to avail herself of it.  (Tr. 11:23–12:5).

Notably, nothing in the Declaration from Sunrise's employee Lisa Keetch—who states she has "full access to all the personnel, payroll and human resources related records pertaining to applicants and past and present employees, including the Plaintiff" (Def. Decl. ¶ 2)—supports Sunrise's counsel's contention that Friedman was "hired" on March 14, 2023.  The Declaration does not indicate that Friedman was hired at any point, was ever put on the company's payroll, or was designated or characterized as an employee for any purpose.  Thus, nothing in the record before the Court suggests that the parties understood Friedman's "date of hire" to be March 14, 2023, or that any reasonable person in their position would believe this to be the case.

Similarly, there is nothing in Sunrise's April 6, 2023 e-mail to Friedman stating or indicating that it is a "termination notice" or that Friedman's "employment" was being terminated. (Tr. 15:3–13). Rather, the e-mail is reasonably understood to signify, as Sunrise acknowledges, that Friedman's *offer* of employment was being withdrawn and that "the position was no longer available for her." (Tr. 15:1–11). The e-mail's expression of thanks to Friedman for her "interest in [the] position," and wish for success in her "career search," make it evident that Sunrise itself did not consider Friedman's employment to have begun at that time. Indeed, in its opening brief, Sunrise did not claim it terminated Friedman's *employment*, but instead claimed it "terminat[ed] Plaintiff's employment *onboarding*." (Def. Br. at 12 (emphasis added)). As discussed above, however, the Dispute Resolution Agreement applies to disputes arising during Friedman's "employment," not to disputes arising during her "employment onboarding."

Where, as here, a conditional offer of employment is rescinded because the conditions are not satisfied, no employment relationship comes into existence. *See, e.g.*, *Johnson v. WinCo Foods, LLC*, 37 F.4th 604, 608–09 (9th Cir. 2022) (offer of employment contingent on drug test created a condition precedent and, thus, applicants who failed to pass drug test did not become employees); *Enigwe v. U.S. Airways/U.S. Airways Express*, 438 F. App'x 80, 83 (3d Cir. 2011) (employer could not be held liable for breach of contract where it terminated conditional offer of employment to applicant who failed a background check, because "[plaintiff] was hired contingent upon his ability to obtain a background security clearance" and

"without a favorable background check, he did not have an offer of employment");
*Lomax v. Vivint Solar Dev., LLC*, 20-cv-1774-JMY, 2020 WL 6781939, at *6 (E.D.
Pa. Nov. 11, 2020) ("Since Defendant rescinded the conditional offer of employment,
the parties did not enter into an employment relationship[.]"); *Wachtel v. Nat'l R.R.
Pass. Corp.*, No. 11 Civ. 613 (PAC), 2012 WL 292352, at *3 (S.D.N.Y. Jan. 30, 2012)
(plaintiff could not sue for breach of employment contract where job offer was
contingent on plaintiff's passing medical and psychological examinations and he did
not take examinations; "[s]ince Plaintiff failed to complete all of the conditions
precedent to the formation of the alleged contract, no contract was ever formed").

Because Friedman was never employed by Sunrise, it follows that her dispute
with Sunrise did not arise "during or after [her] employment" and, thus, her claims
fall outside the scope of the Dispute Resolution Agreement.

### 4.    Relevant Case Law

In similar circumstances, courts have denied motions to compel arbitration of
claims brought by individuals who were given a conditional offer of employment but
never became an employee.  In *Steele v. Fannie Mae*, No. 13-01089 (RCL), 2013 WL
5205898 (D.D.C. Sept. 13, 2013), for example, the court denied the employer's
motion to compel arbitration where the employer had sent the plaintiff a letter
rescinding its conditional offer of employment.  Based on the letter—which
"mention[ed] nothing of terminating [plaintiff's] employment but rather state[d]
that the company had reached the decision to rescind his offer of employment"—it
was clear that defendant "decided not to employ" plaintiff and that plaintiff "was

[n]ever, in fact, an employee." *Id.* at *2. Similarly, in *Lomax*, *supra*, the court denied the employer's motion to compel arbitration because the employer rescinded its conditional offer of employment and, as a result, the plaintiff "never received employment" and "the parties did not enter into an employment relationship." 2020 WL 6781939, at *5–6; *see also Monfort*, 2019 WL 13097865, at *6 (denying motion to compel arbitration where employer withdrew conditional offer of employment based on results of background check because "[plaintiff's] employment with [defendant]" was a condition precedent to arbitration agreement and "[i]t is undisputed that this condition precedent did not occur—plaintiff was not hired").[11]

The cases cited by Sunrise do not support a contrary result. Emphasizing that the Dispute Resolution Agreement broadly encompasses disputes that "arise out of or relate in any way" to Friedman's employment, Sunrise cites to decisions where courts have determined similar language encompassed "failure to rehire" claims. (Def. Br. at 12–13 (citing *Johnson v. Ergon W. Virginia, Inc.*, No. CIV.A. 14-453, 2015 WL 5286234 (W.D. Pa. Sept. 10, 2015); *Varallo v. Elkins Park Hosp.*, 63 F. App'x 601 (3d Cir. 2003))). But "failure to rehire" claims necessarily involve a significant circumstance not present here: an undisputed employment relationship at some point in time. *See Varallo*, 63 F. App'x at 604 ("It would be virtually impossible for [the plaintiff] to allege a factual basis for unlawful discrimination in

---

[11] The courts in *Steele*, *Lomax*, and *Monfort* declined to compel arbitration on the ground that the arbitration agreements were not valid and enforceable (an argument that Friedman does not make here). *See Steele*, 2013 WL 5205898, *2; *Lomax*, 2020 WL 6781939, at *4–6; *Monfort*, 2019 WL 13097865, at *2–3, *6. Nevertheless, insofar as the cases hold that the withdrawal of the plaintiff's conditional offer of employment meant that the plaintiff was not employed by the defendant, the Court finds *Steele*, *Lomax*, and *Monfort* to be instructive with respect to the parties' dispute concerning the scope of the Dispute Resolution Agreement.

22

the Hospital's failure to rehire her without invoking events that occurred against the backdrop of and within the context of her employment and its termination.").

Sunrise's reliance on *SouthTrust Securities, Inc. v. McClellan*, 730 So.2d 620 (Ala. 1999), is likewise unavailing. There too, it was undisputed that the plaintiff-stockbroker had in fact "become an employee of [defendant]." *Id*. at 621. He later sued, claiming the defendant had fraudulently induced him to leave his prior employer on the basis of misrepresentations during the hiring process. *Id*. "Broadly constru[ing]" the term "employment" to include "the hiring process, that is, the act of employing," the court found that this claim was subject to arbitration under an NASD rule requiring arbitration of any dispute between plaintiff and his employer "arising out of the employment or termination of employment." *Id*. at 621–22. Here, by contrast, the Dispute Resolution Agreement is temporally limited to claims that arose "during or after" Friedman's employment—which never began—and Friedman's claims, unlike those of the plaintiff in *SouthTrust*, do not depend on her having been employed by the employer.

Further, *SouthTrust*, which was decided prior to the Supreme Court's decision in *Granite Rock*, began its analysis with the principle that "courts must construe arbitration agreements broadly, resolving all doubts in favor of arbitration," and reasoned that a broad construction was "particularly appropriate" based on the policy reflected in Supreme Court precedent "strongly advancing arbitration of all disputes related to the securities industry." *Id*. at 622. This approach, however, is contrary to the framework subsequently mandated by *Granite*

*Rock*.  That framework, as explained by the Second Circuit, requires the court to *first* determine, under "ordinary principles of contract interpretation," whether the dispute is covered by the arbitration agreement, with recourse to the presumption of arbitrability allowed *only* as a "last, rather than first, resort" if the agreement "is ambiguous as to its scope."  *Local Union 97*, 67 F.4th at 113–14; *see also Granite Rock*, 561 U.S. at 302–03 (federal policy favoring arbitration does not "override[] the principle that a court may submit to arbitration only those disputes that the parties have agreed to submit" and applies only where the arbitration agreement is "best construed to encompass the dispute") (cleaned up).

Here, the presumption of arbitrability, upon which Sunrise relies heavily (Def. Br. at 13; Reply at 2), does not aid Sunrise because, applying ordinary principles of contract law, the arbitration agreement is unambiguous.  It only encompasses disputes arising "during or after" Friedman's employment, and the undisputed facts in the record establish that Friedman was never employed by Sunrise.  The parties therefore did not agree to arbitrate Friedman's claims.  To apply a presumption of arbitrability to override that conclusion would conflict with "'the first principle that underscores all of [the Supreme Court's] arbitration decisions: Arbitration is strictly a matter of consent.'"  *Local Union 97*, 67 F.4th at 114 (quoting *Granite Rock*, 561 U.S. at 299); *see also Asterope Shipping Co. v. CSC Sugar LLC*, No. 24 Civ. 962 (JSR), 2024 WL 4692021, at *3 (S.D.N.Y. Nov. 6, 2024) (arbitration agreements "'must not be so broadly construed as to encompass claims and parties that were not intended by the original contract'") (quoting *Thomson-*

*CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).  Because the scope of the parties' arbitration agreement is not ambiguous, the Court "need not—and indeed, may not—apply a presumption of arbitrability." *Local Union 97*, 67 F.4th at 116.

Accordingly, this action is beyond the scope of the parties' agreement to arbitrate, and Friedman may proceed to litigate the merits of her claims before the Court.

## CONCLUSION

For the reasons set forth above, Defendant's motion to compel arbitration is **DENIED**.  Defendant shall file its Answer to Plaintiff's Complaint within 14 days of this Opinion & Order.

Dated:       New York, New York
             March 31, 2025

_____
GARY STEIN
United States Magistrate Judge